AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

# UNITED STATES DISTRICT COURT

for the

District of New Mexico  ▾

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The four (4) premises and three (3) persons described in<br>Attachment A, which has been attached hereto and<br>incorporated herein | )<br>)<br>)  Case No.<br>)<br>) |

Case No.  23-MR-202
23-MR-203
23-MR-205
23-MR-206

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | - Possession with intent to distribute a controlled substance and conspiracy. |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.*

*Applicant's signature*

Bryan Acee, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ email and telephone _____ *(specify reliable electronic means).*

Date:  January 30, 2023

*Judge's signature*

City and state:  Albuquerque, New Mexico

Karen B. Molzen, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

### INTRODUCTION

1.      I, Bryan Acee, Special Agent of the Federal Bureau of Investigation (FBI), being first duly sworn, make this affidavit in support of an application for a warrant to search the following premises (hereinafter referred to as the "Subject Premises"):

**Location 1:** 1720 Coors Boulevard SW, Albuquerque, New Mexico 87121;[1]

**Location 2:** 340 West Bluff Street NW, Albuquerque, NM 87121;

**Location 3:** 3123 Leo Road SW, unit A, Albuquerque, NM, 87105; and

**Location 4:** Extra Space Storage, 141 Airport Drive NW, units C5A and B80, Albuquerque, New Mexico 87121.

2.      More detailed descriptions and photographs of the Subject Premises are contained within "Attachment A," which has been attached hereto and incorporated herein by this reference.

3.      I am also requesting the Court's permission to collect DNA buccal swabs from:

**Person 1:** Manuel YOUNG, aka: "Ike,"

**Person 2:** Danny BACA, aka: "Scrappy," or "Scrap Em," and

**Person 3:** Crystal KELLEY.

4.      The DNA evidence will be analyzed against drug packaging materials collected by an informant during an undercover drug buy (explained further herein), as well as any drug packaging materials or firearms collected during the execution of the requested search warrants.

5.      Photographs of the aforementioned subjects have been included in Attachment A, which has been attached hereto and incorporated herein by this reference.

---

[1]  Records from the Bernalillo County Assessor's Office indicate the property is split into two parcels; however, the address for both parcels is 1720 Coors Boulevard SW. The eastern parcel was listed as non-residential.

## PURPOSE OF THE AFFIDAVIT

6.     The FBI Albuquerque Violent Gang Task Force (VGTF) has been engaged in the investigation of Manuel YOUNG, aka: "Ike," Danny BACA, aka: "Scrappy," or "Scrap Em," and Crystal KELLEY (hereinafter the "Target Subjects") and others, all of whom are involved in the distribution of fentanyl and methamphetamine within the District of New Mexico. This affidavit is submitted in support of four warrants to search the Target Subjects and Subject Premises, which are believed to contain evidence of violations of:

   a)   21 U.S.C. § 841(a) possession with intent to distribute controlled substances;

   b)   21 U.S.C. § 843(b) use of a communication facility in furtherance of drug trafficking;

   c)   21 U.S.C. § 846 conspiracy to distribute controlled substances; and

   d)   21 U.S.C. § 856 maintaining drug involved premises.

The violations listed above shall be referenced as the "Target Offenses" hereinafter.

7.     I am submitting this affidavit based upon my experience and familiarity with the instant investigation. This affidavit does not set forth all my knowledge or summarize all of the investigative efforts in the overall investigation; rather, this affidavit sets forth facts that support probable cause to search the requested locations and persons, as well as relevant background information. During my investigation, I have developed information I believe to be reliable from the following sources:

   a.   Information from FBI undercover employees and Confidential Human Sources (CHS for both plural and singular);

   b.   Information provided by law enforcement or corrections officials;

   c.   Information provided by cooperating defendants who have legal representation and pending charges;

   d.   Results of physical and electronic surveillance;

    e. Information derived from consensually recorded conversations;

    f. Records from the FBI National Crime Information Center (NCIC), New Mexico Corrections Department, New Mexico Courts, Oklahoma Courts, and the New Mexico Motor Vehicle Division.

8.    Where I refer to conversations herein, they are related in substance and, in-part, based on conversations between fellow agents, task force officers, detectives, intelligence analysts, institutional gang investigators, or CHS that assisted law enforcement. All figures, times, weights, and calculations set forth herein are approximate.

**AFFIANT'S RELEVANT TRAINING AND EXPERIENCE**

9.    I have been a law enforcement officer for 23 years, serving as a police officer, detective, task force officer and special agent. I have been with the FBI since 2009 and have primarily worked transnational organized crime, violent crime, and gangs. Over the past 23 years, I have arrested several hundred persons for offenses related to drug distribution, gang crimes, racketeering offences, firearm violations, homicide, armed robbery, carjacking, assault, and other crimes. Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations (DTOs), and gang/criminal enterprises to purchase, transport, store, and distribute controlled substances. I am also familiar with how those individuals and organizations conceal the often substantial profits generated from their criminal activities.

10.    I served as the lead FBI case agent in the government's 2010-2014 Continuing Criminal Enterprise Drug Kingpin Act case against the Cartel de Juarez (or Juarez Cartel), which resulted in extensive seizures of controlled substances, currency, firearms, and the indictment of multiple cartel leaders. Several cartel leaders were extradited to the United States. Other cartel leaders are pending extradition to the United States.

11.     I am the lead case agent in the government's 2015-2023 gang racketeering case against the Sindicato de Nuevo Mexico (SNM) prison gang, which encompasses substantial drug trafficking activities, firearm-related offenses, and numerous homicides. To date, 170 SNM members and associates have been arrested and 12 gang related homicides were charged as federal racketeering murders.

12.     I have qualified, in federal and state court, as an expert witness on drug trafficking, possession with intent to distribute controlled substances, and the Juarez Cartel. I have also qualified in federal court as an expert witness regarding firearms, ammunition, interstate nexus, and firearm possession as it relates to drug trafficking. I am an FBI subject matter expert on the Juarez Cartel and SNM.

13.     I have served as an adjunct professor, law enforcement instructor, and presenter on drug and gang investigations at the California Highway Patrol, Los Angeles Police Department, New Mexico State Police, and Bernalillo County Sheriff's Office academies; as well as at training classes and seminars for the Organized Crime Drug Enforcement Task Force, California Narcotic Officers Association, California Gang Investigators Association, Southern California Outlaw Motorcycle Gang Task Force, International Outlaw Motorcycle Gang Task Force, New Mexico Gang Task Force, New Mexico State University, and University of New Mexico.

## BACKGROUND ALLEGATIONS REGARDING GANGS AND DRUG TRAFFICKERS

14.     Based upon my training, experience, and participation in this investigation, as well as the investigation of other gang/criminal enterprises and DTOs, I am aware of the following information:

   a) Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain documents, letters and records relating to their illegal activities for long

periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses. This documentary evidence includes: telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

b) Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain regular contact with one another. This contact does not terminate once an individual is incarcerated. Members of gang/criminal enterprises routinely send and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, to include financial help and/or witness intimidation or elimination (as is the case in the instant investigation). Incarcerated members of gang/criminal enterprises communicate via telephone calls, some of which are generated via third parties. In addition, incarcerated members often keep photographs of themselves and other members of the gang/criminal enterprise in order to impress or intimidate others.

c) I am aware gang members aggressively pursue informants, suspected informants, and persons who betray the gang(s). I am aware gang members relay such information to one another through covert communications, messages, emails, telephone calls, personal visits, letters, and mail disguised as "legal mail."

d) I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I am aware incarcerated members of gang/criminal enterprises utilize a non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood corrections officers will monitor the call.

e) I know that members and associates of gang/criminal enterprises and DTOs maintain stash houses, rental properties, apartments, storage units, and similar assemblies to store controlled substances and drug proceeds.

f) In addition, I am also familiar with the use of text messaging, instant messaging, and messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement.

g) Individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences, businesses, storage units, stash houses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, storage units, carports and outbuildings. They also

conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses. I have also observed individuals involved in drug trafficking bury evidence underground in containers on their property.

h) Members of gang/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who have assisted drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, both in hard copy or electronic form. I have personally been involved in search warrants which resulted in the discovery of such records that were more than a year old.

i) Individuals involved in gang/criminal enterprises and DTOs possess items of

identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

j)  I know that firearms are instrumentalities of the crime of drug trafficking and that firearms are critical "tools of the trade" for the gang members and they are expected to possess and maintain firearms. I am aware members of DTOs often possess firearms to protect their drug supply and proceeds.

k)  I know that fingerprints and DNA evidence may be transferred to drug packaging materials, firearms, and ammunition.

15.  The items described above are often stored by members of gang/criminal enterprises and DTOs on their person, in their businesses, residences, stash houses, and surrounding garages, outbuildings, and yards, the residences of friends or relatives, and vehicles.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

16.  In October 2022, I was contacted by a CHS[2] who advised Echo Park gang member Manuel YOUNG, aka: "Ike" had taken over drug sales for his brother Jesse YOUNG, aka: "Lobo," after agents arrested Lobo. By way of background, I obtained 15 federal search warrants in late August

---

[2] The CHS has been cooperating with the FBI for approximately seven years and has testified as a government witness in numerous federal jury trials. The CHS is an experienced informant and has conducted controlled buys, introduced undercover agents to targets of FBI investigations, worn covert FBI recording devices on the street and in a maximum-security prison facility. The CHS does not have any pending charges and has received approximately $17,000 in financial assistance from the FBI. The CHS has felony convictions for murder, armed robbery, aggravated battery, trafficking a controlled substance, and possession of a controlled substance. I found information from the CHS to be reliable because much of it was corroborated by independent source information, undercover FBI agents, other law enforcement investigations, controlled drug buys, and physical and electronic surveillance. To my knowledge, the CHS's information has not been found to be false or misleading.

2022 in support of a gang racketeering investigation involving the SNM, Sureños, and West Side Locos gangs. The search warrants sought evidence of two gang related homicides and an intergang conspiracy to distribute fentanyl and methamphetamine. The search warrants were executed on September 1, 2022, and resulted in the arrest of Jesse YOUNG, aka: "Lobo," and the seizure of 1.1 million fentanyl pills, 147 pounds of methamphetamine, $1.8 million in cash, 37 firearms, thousands of rounds of ammunition, nine ballistic vests, and five vehicles.[3]

17.     The facts and circumstances in the current investigation are very similar to the investigation over the summer of 2022, in that two Albuquerque gangs are working together to obtain bulk quantities of methamphetamine and fentanyl from a Mexican cartel source to distribute to street level dealers in Albuquerque. The primary targets of the investigation are from different gangs, Manuel YOUNG, aka: "Ike," is an Echo Park Sureño and Danny BACA, aka: "Scrappy," is a West Side Loco. Crystal KELLEY is not a gang member, but is a well-known career criminal who has been featured on local media and an A&E documentary.[4]

18.     Information from the CHS, who infiltrated the organization, is that the Target Subjects distribute to other Albuquerque gang members from the SNM, Los Padillas, and Burqueños.

19.     I advised the CHS to maintain contact with the Target Subjects and attempt to learn more about their operation. The CHS did so and in the weeks that followed, reported the following

---

[3] The vast majority of drugs, currency, and firearms were seized from the residence of Jesse YOUNG. Other defendants were subsequently arrested on federal charges and the fentanyl seizure was the largest in FBI history.

[4] https://www.koat.com/article/kelley-sisters-in-the-spotlight-for-all-the-wrong-reasons/16597085

https://www.koat.com/article/despite-warnings-jessica-kelley-s-sister-talks-about-young-girl-s-murder-in-phone-calls/23574225

https://www.crimeonline.com/2017/12/11/murder-suspects-sister-on-witness-list-in-10-year-old-victoria-martens-brutal-rape-and-killing-investigation/

https://www.aetv.com/specials/behind-bars-women-unchained

information:

a)  Manuel YOUNG is a member of the Echo Park Sureños gang in Albuquerque and was known to be very paranoid in regards to law enforcement attention;

b)  Manuel YOUNG was so paranoid about being caught by the "feds," he used go-betweens to arrange drug deals and kept his drugs at a storage unit so as not to be caught at home with drugs;

c)  Manuel YOUNG used West Side Locos gang member Danny BACA to distribute drugs to other persons;

d)  Manuel YOUNG and his family had a reputation as being "serious ballers" (drug dealers) and "killers," as well as being associated with a New Mexico prison gang. Manuel YOUNG's brothers had committed murders: Robert YOUNG killed a prison guard at the Guadalupe County Correction Facility in 1999 and received a life sentence and Jesse YOUNG killed two people on Albuquerque's west mesa, but the charges were subsequently dropped due to a bad search warrant.[5]

e)  Manuel YOUNG had been strung out on drugs in recent years and only began selling significant quantities of drugs after his brother Jesse YOUNG was picked up by the feds.

f)  Manuel YOUNG's girlfriend is Crystal KELLEY and she is very involved in Manuel YOUNG's distribution. KELLEY often runs YOUNG's drug operation when YOUNG is strung out on dope.

g)  KELLEY has a reputation of being fierce and was "not to be messed with."

---

[5] My understanding of the incidents and local media coverage tend to corroborate the CHS' statements:
https://www.abqjournal.com/16217/life-sentence-for-man-convicted-of-prison-guards-murder.html
https://www.abqjournal.com/119554/suspect-arrested-in-strangling-death.html

h) Danny BACA dealt drugs for Manuel YOUNG, but was also a heavy fentanyl and methamphetamine user;

i) Danny BACA was on state probation and likely would be going to jail because he kept ignoring his probation officer's requests to go to drug treatment; [6]

j) the Target Subjects utilized cellular telephones to communicate with one another and their customers.

20.     In the paragraphs that follow I have detailed the controlled purchase of 2,000 fentanyl pills from the Target Subjects. This information was also used in a related criminal complaint to charge the Target Subjects with federal drug distribution charges. I would not normally provide the exact date of the controlled buy in a search warrant affidavit; however, the information is being used in the related complaint and the CHS is a testifying source that has testified for the government in five jury trials, as well as related motions hearings.

**Controlled Buy of 2,000 Fentanyl Pills:**

21.     On January 26, 2023, the CHS contacted BACA and requested to purchase 2,000 fentanyl pills from Manuel YOUNG. BACA readily agreed to the deal and told the CHS to pick him up so they could travel to Manuel YOUNG's house together. BACA told the CHS the 2,000 fentanyl pills would cost $4,000. BACA subsequently told the CHS that he (BACA) had talked to Manuel YOUNG and the price per boat (or 1,000 pills) would go down to $1,500 per 1,000 pills after the first deal had concluded. BACA also spent considerable time explaining to the CHS that the CHS could only go to YOUNG through him (BACA). BACA related a story in which a female drug

---

[6] I verified BACA is currently on probation under the supervision of the New Mexico Corrections Department (NMCD) Probation-Parole Division (PPD) for being a felon in possession of a firearm, Bernalillo County Case No. 202-CR-2019-2048 and two charges of possession of a controlled substance, Bernalillo County Case No. 202-CR-2019-2048 and D-202-CR-2021-429. I spoke with a supervisor with NMCD and verified BACA's residence of record is 340 West Bluff Street NW, Albuquerque, NM 87121. PPD records indicated BACA was using drugs and failing to follow the directions of his probation officer.

buyer from Gallup, NM, had attempted to buy from YOUNG directly and she was reprimanded and humiliated. BACA said the female buyer showed up at YOUNG's place (1720 Coors Boulevard SW) and asked for YOUNG. The woman was questioned as to why she had come without BACA and YOUNG and KELLEY took her cell phone from her and made her stand on the other side of Coors Boulevard SW and wait for BACA to show up. The woman was not allowed to reenter her car, which remained at YOUNG's residence, and stood outside in the cold for more than an hour.

22.     Prior to the CHS picking BACA up, FBI agents met with the CHS and searched the CHS' person and vehicle with negative results. The CHS was provided with a covert FBI audio and video recording device[7] and $4,000 in official funds. Agents maintained physical and electronic surveillance on the CHS, as the CHS picked up BACA. The CHS then drove BACA to YOUNG's residence at 1720 Coors Boulevard SW. On the way to the location, BACA contacted YOUNG and verified he was on his way to pick up two boats (2,000 fentanyl pills).

23.     BACA told the CHS to park across the street from YOUNG's residence on Coors Boulevard SW. BACA then walked across the street to YOUNG's residence and briefly met with YOUNG (passenger) and KELLEY (driver) as YOUNG and KELLEY prepared to depart their residence in a black Ford pick-up. BACA walked back to the CHS; however, on his way through the parking lot he scrutinized the other vehicles closely. When BACA got back into the CHS' vehicle, he correctly pointed out two FBI surveillance vehicles (which were subsequently replaced with other surveillance vehicles). BACA told the CHS that YOUNG was heading to his stash location to get the boats and would lower the price per boat from $2,000 to $1,500 on future deals.

24.     BACA and the CHS remained in the parking lot until YOUNG and KELLEY returned with

---

[7] The covert audio and video recording device also featured a live mode, which was utilized and viewed in real-time by FBI case agents.

the drugs. As they waited, BACA and the CHS discussed various topics, to include: BACA describing the armed robberies he had been committing, his desire to get a crew together to hit an armored car; his gang upbringing and the fact that the younger generation of WSL members were weak; the status of his child support payments; his drug use, and fact that he was not complying with the conditions of his probation. At various times, BACA would check in with YOUNG via telephone or walk over to YOUNG's residence to see him in person.

25.    FBI agents maintained surveillance on BACA and YOUNG/KELLEY. Agents monitored YOUNG/KELLEY as they drove from their residence on Coors to a nearby Dollar General store and then to the Extra Space Storage facility at 141 Airport Drive NW, Albuquerque.

26.    YOUNG and KELLEY parked their truck in the row of storage units located within the B and C rows. Agents could not see exactly which unit YOUNG and KELLEY entered because they left their headlights on and it was dusk. Agents observed both subjects walking around their truck and to and from units B and C.

27.    Agents subsequently met with a manager at Extra Space Storage and confirmed YOUNG and KELLEY had two small storage units located at the exact spot they had parked – units B80 and C5A. The manager recognized both YOUNG and KELLEY as frequent visitors and provided agents with their rental information, gate access records, and identified both by photograph.

28.    After spending several minutes at the storage units, YOUNG (driver) and KELLEY (passenger) drove to a near-by gas station and KELLEY put gas in their truck. They then drove a short distance to a Dion's drive-thru and picked up food. After retrieving their food, they drove back to their residence on Coors Boulevard SW.

29.    BACA and the CHS walked across the street and met YOUNG and KELLEY at their truck. As they approached the truck, KELLEY said to YOUNG, "No, keep it between the plates."

KELLEY was in the front passenger seat and YOUNG was behind the wheel.

30.     The CHS stood at the passenger side window next to KELLEY, who was seated inside. YOUNG passed two paper plates to KELLEY and she placed a small pizza on top of the plates and handed the pizza and plates (concealing the two boats of fentanyl) to the CHS. The CHS took the pizza box and plates. The CHS spoke with YOUNG and KELLEY and thanked YOUNG for selling to the CHS. The CHS verified the price was $4,000 and then gave the money to YOUNG. The CHS thanked YOUNG and KELLEY again and the CHS and BACA walked back to the CHS' vehicle.  On the way back to the vehicle, BACA attempted to get some of the pills from the CHS but the CHS declined and said he would take care of BACA later. The CHS handed the pizza to BACA and put the two plastic bags containing the fentanyl into the CHS's pocket. The CHS then dropped BACA off at BACA's residence, located at 340 West Bluff Street NW.

31.     Agents followed the CHS to a predetermined location and recovered the recording device and drug evidence. The CHS and the CHS's vehicle were searched with negative results. The CHS was interviewed about the transaction and signed a government receipt documenting the use of the official funds.

32.     The amount of fentanyl purchased from the Target Subjects was two boats or 2,000 pills, which had an approximate net weight of 212.5 grams. The purchase price was $4,000. I viewed the drug evidence and recognized them to be blue tablets labelled M-30, which are commonly referred to as "blues," "M30s," or "beans." I have seized more than one million such pills in Albuquerque in recent years. The drugs purchased from the Target Subjects were placed into FBI evidence after it was collected from the CHS and will be sent to the DEA laboratory for a comprehensive examination.

33. **Arrest Warrants**: YOUNG, KELLEY, and BACA are currently being sought on federal arrest warrants in relation to their participation in the aforementioned drug deal.

## THE TARGET SUBJECTS

34. YOUNG has at least nine prior arrests in New Mexico and California and no felony convictions. YOUNG has several domestic violence filings against him by other persons, to include KELLEY, but no domestic violence related convictions.

35. KELLEY has fourteen prior arrests in arrests in New Mexico with felony convictions for two counts of great bodily injury by vehicle and residential burglary.

36. BACA has eight prior arrests in New Mexico with felony convictions for child abuse, possession of a controlled substance, hit and run, being a felon in possession of a firearm, and possession of a controlled substance. BACA is currently on state probation for being a felon in possession of a firearm and possession of a controlled substance.

## THE SUBJECT PREMISES

37. Location 1: **1720 Coors Boulevard SW, Albuquerque, New Mexico** 87121, may be described as a large piece of property with one off-white colored single-story residential structure on the west end of the property. Two white camper trailers are parked on the east end of the property. A fence encloses the entire property. The property has a partial fence that separates the property in half; however, county records list the entire property as one address with the same owner. The numbers 1720 are posted on the mailbox in front of the residence, which runs along Coors Boulevard SW. Color photographs of the location have been included in Attachment A. I believe Target Subjects Manuel YOUNG and Crystal KELLEY manage drug sales from this residence and live there on a part-time basis. Agents have observed YOUNG and KELLEY at the location on numerous times in recent weeks and the controlled buy took place at this location.

Official law enforcement records list the Subject Premises as KELLEY's residence.

38.    Location 2: **340 West Bluff Street NW, Albuquerque, NM 87121,** may be described as a singlewide trailer with tan and brown colored siding and white trim. The numbers 340 are posted on the front of the trailer. Color photographs of the location have been included in Attachment A. I believe Target Subject Danny BACA resides at the location. The CHS dropped BACA off at this location after the controlled buy and this location is BACA's residence of record with state probation.

39.    Location 3: **3123A Leo Road SW, Albuquerque, New Mexico, 87105,** may be described as a single-story residence, with pink siding and white trim. There are several disabled cars parked in front of the house and the numbers 3123A are posted on a gray mailbox in front of the residence. There is a white metal security door over the front door. A color photograph of the Subject Premises has been attached and incorporated in Attachment A. I believe Target Subject Manuel YOUNG lives at this location on a part-time basis. FBI agents searched this location during the September 1, 2022, takedown operation and seized $20,000 in drug proceeds. I am aware YOUNG's mother and YOUNG's children reside at this residence. The Subject Premises is listed as YOUNG's residence on his New Mexico driver's license.

    Location 4: **Extra Space Storage, 141 Airport Drive NW, units C5A and B80, Albuquerque, New Mexico 87121,** may be described as a commercial storage facility with a large green and white sign in front of the business entrance. Each storage unit is individually marked with letters and numbers. Color photographs of the location have been included in Attachment A. I believe Target Subjects Manuel YOUNG and Crystal KELLEY store drugs at the listed storage units.

## DNA EVIDENCE COLLECTION

40.     I am requesting the Court's permission to collect DNA buccal swabs from YOUNG,

KELLEY, and BACA to compare to drug packaging materials collected by the CHS, as well as

any drug packaging materials or firearms collected during the execution of the requested search

warrants. I am aware the FBI Laboratory requires side-by-side comparisons of evidence and DNA

in cases involving known subjects, such as in the instant investigation. I know DNA evidence may

easily be transferred to drug packaging materials and firearms. I have utilized such DNA evidence

in prior investigations and during jury trials.

## BIOMETRIC ACCESS TO DEVICES

41.     I know from my training and experience, as well as from information found in publicly

available materials published by device manufacturers, that many electronic devices, particularly

newer mobile devices, offer their users the ability to unlock the device through biometric features

in lieu of a numeric or alphanumeric passcode or password. These biometric features include

fingerprint scanners, facial recognition features and iris recognition features. Some devices offer

a combination of these biometric features, and the user of such devices can select which features

they would like to utilize.

42.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock

the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID,"

which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint

is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID

sensor, which is found in the round button (often referred to as the "home" button) located at the

bottom center of the front of the device. The fingerprint sensors found on devices produced by

other manufacturers have different names but operate similarly to Touch ID.

43.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

44.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

45.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

46.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will

be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

47.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, is inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device may exist for only a short time.

48.     Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the fingers (including thumbs) of the Target Subjects to the fingerprint scanner of the devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of the face of the Target Subjects and activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the face of the Target Subjects and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed

warrant does not authorize law enforcement to request that the Target Subjects state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask the Target Subjects to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

49.     Based on the aforementioned information, I submit that probable cause exists to search the Subject Premises and Target Subjects, described in Attachment A, for the items described in Attachment B, which are evidence, fruits, and instrumentalities of, or property designated for use, intended for use, or used in committing violations of 21 U.S.C. §§ 841(a), 843(b), 846, and 856. This affidavit has been reviewed by Assistant United States Attorney Paul Mysliwiec, of the District of New Mexico.

Respectfully submitted,

Bryan Acee
FBI Special Agent

Electronically submitted and telephonically sworn to before me on January 30 , 2023.

The Honorable Karen B. Molzen
United States Magistrate Judge

**ATTACHMENT A**
**Person and Premises to be Searched**

**Persons to be searched:** MANUEL YOUNG, aka: "IKE," and CRYSTAL KELLEY who appear in the photographs below. The Defendants will be searched for a DNA sample via buccal swab.



**Premises to be searched**: 1720 Coors Boulevard SW, Albuquerque, New Mexico 87121, may be described as a large piece of property with one off-white colored single-story residential structure on the west end of the property. Two white camper trailers are parked on the east end of the property. A fence encloses the entire property. The property has a partial fence that separates the property in half; however, county records list the entire property as one address with the same owner. The numbers 1720 are posted on the mailbox in front of the residence, which runs along Coors Boulevard SW. Color photographs are posted below. The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, storage containers, and vehicles parked at, or in front of, the Subject Premises.[1]



**Note**: Photos above are from the Bernalillo County Accessor's Office. The property is split into two parcel numbers; however, the address for both parcels is 1720 Coors Boulevard SW. The second parcel, located on the eastern part of the property was listed as non-residential.

---

[1] Only vehicles parked at the Subject Premises or in front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Attachment A-1

## ATTACHMENT A
### Person and Premises to be Searched

**Biometric Access to Devices:** During the execution of the search of the premises described herein, law enforcement are also specifically authorized to compel the DEFENDANT(S) to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

a.  Any devices found at the premises, and
b.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments
c.  for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.
d.  This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the DEFENDANT(S) state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

*KBM*

Attachment A-2

**ATTACHMENT A**
**Person and Premises to be Searched**

**Persons to be searched:** DANNY BACA, aka: "SCRAPPY," or "SCRAP EM," who appears in the photograph below. The Defendant will be searched for a DNA sample via buccal swab.



**Premises to be searched**: 340 West Bluff Street NW, Albuquerque, NM 87121. The Subject Premises is described as a singlewide trailer with tan and brown colored siding and white trim. The numbers 340 are posted on the front of the trailer. A color photograph is posted below. The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, storage containers, and vehicles parked at, or in front of, the Subject Premises.[1]



**Biometric Access to Devices:** During the execution of the search of the premises described herein, law enforcement are also specifically authorized to compel the DEFENDANT(S) to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

a.  Any devices found at the premises, and
b.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments
c.  for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.
d.  This warrant does not authorize law enforcement personnel to compel any other individuals found at the

---

[1] Only vehicles parked at the Subject Premises or in front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

*KBM*                                                                    Attachment A-1

**ATTACHMENT A**
**Person and Premises to be Searched**

premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the DEFENDANT(S) state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

Attachment A-2

**ATTACHMENT A**
**Person and Premises to be Searched**

**Persons to be searched:** MANUEL YOUNG, aka: "IKE," and CRYSTAL KELLEY who appear in the photographs below. The Defendants will be searched for a DNA sample via buccal swab.



**Premises to be searched:** 3123 Leo Road SW, unit A, Albuquerque, New Mexico, 87105. The Subject Premises is described as a single story residence, with pink siding and white trim. There are several disabled cars parked in front of the house and the numbers 3123A are posted on a gray mailbox in front of the residence. There is a white metal security door over the front door. Color photographs are posted below. The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, storage containers, and vehicles parked at, or in front of, the Subject Premises.[1]



**Biometric Access to Devices:** During the execution of the search of the premises described herein, law enforcement are also specifically authorized to compel the DEFENDANT(S) to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

a.  Any devices found at the premises, and
b.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments
c.  for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

---

[1] Only vehicles parked at the Subject Premises or in front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

*KBM*                                                                                    Attachment A-1

**ATTACHMENT A**
**Person and Premises to be Searched**

d.  This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the DEFENDANT(S) state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

Attachment A-2

## ATTACHMENT A
### Premises to be Searched

**Extra Space Storage, 141 Airport Drive NW, units C5A and B80, Albuquerque, New Mexico 87121**, may be described as a commercial storage facility with a large green and white sign in front of the business entrance. Each storage unit is individually marked with letters and numbers. The Subject Premises is marked with designator C5A and B80 above the door.  The search shall include the entire storage unit and all contents within units C5A and B80.

<u>Note</u>: Law enforcement officers will note the make/model/serial number of any property within the specified units. Such notes may be used to query the property in law enforcement databases and determine the value of the property.





*KBM*

Attachment A

**ATTACHMENT B**
**Items to be Seized**

**Items to be Seized:** All evidence, fruits, and instrumentalities of violations of: 21 U.S.C. § 841(a) possession with intent to distribute controlled substances; 21 U.S.C. § 843(b) use of a communication facility in furtherance of drug trafficking; 21 U.S.C. § 846 conspiracy to distribute controlled substances; 21 U.S.C. § 856 maintaining drug involved premises; to include the following items:

1. Controlled substances, drug packaging material, paraphernalia, and scales;

2. Firearms, magazines, and ammunition;

3. United States currency;

4. Documentary evidence of drug trafficking, to include records, receipts, notes, ledgers, money orders, money order receipts, pre-paid money cards or other debit cards, and any documents relating to transporting, ordering, purchasing, transporting, or distributing drugs;

5. Cellular telephones;

6. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys;

7. Safes, combinations or key-lock strong boxes or other secure storage containers, and types of locked or containers, and hidden compartments that may contain any of the foregoing.

**Persons to be Seized:** DNA evidence will be collected from Manuel YOUNG, aka: "Ike," Danny BACA, aka: "Scrappy" or "Scrap Em," and Crystal KELLEY via buccal swabs.

Attachment B